IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

**DIANE TYLER**,

                     Plaintiff                                Civil No. 09-232-ST

                v.                                      **OPINION AND ORDER**

**MICHAEL J. ASTRUE**,
Commissioner of Social Security,

                      Defendant.

STEWART, Magistrate Judge:

Plaintiff, Diane Tyler ("Tyler"), seeks judicial review of the Social Security Commissioner's

final decision denying her application for Disability Insurance Benefits ("DIB") and Supplemental

Security Income ("SSI") under Titles II and XVI of the Social Security Act ("Act").  This court has

jurisdiction under 42 USC §§ 405(g) and 1383(c).  All parties have consented to entry of final

judgment by a Magistrate Judge in accordance with FRCP 73 and 28 USC § 636(c).

For the following reasons, the Commissioner's decision is reversed and remanded for the

immediate calculation and award of benefits consistent with this Opinion and Order.

## PROCEDURAL BACKGROUND

Tyler first applied for DIB and SSI on March 14, 2005, with a protective filing date of

February 15, 2005, alleging disability since December 1, 2004, due to multiple sclerosis.  Tr. 69-73,

87, 101-05, 371-73.[1]  The Commissioner denied the applications initially and upon reconsideration.

Tr. 35-44, 375-83.  After a hearing held on May 14, 2007 (Tr. 399-444), an Administrative Law

Judge ("ALJ") issued a decision on August 20, 2007, finding Tyler not disabled.  Tr. 15-26.  Tyler

appealed this determination to the Appeals Council.  While this appeal was pending, Tyler filed a

second DIB application which the Commissioner granted by finding her disabled as of May 20,

2008.  On December 23, 2008, the Appeals Council accepted additional evidence and denied review,

making the ALJ's decision the final decision of the Commissioner regarding her first application.

Tr. 6-9.  Tyler appeals that decision.

## BACKGROUND

### I.    Medical Record

#### A.    2002-04

The medical record begins in November 2002, when Scott R. Jacobson, M.D., noted that

Tyler appeared depressed with a flat affect and diagnosed left shoulder strain.  Tr. 149-50.  She

---

[1] Citations "Tr." refer to indicated pages in the official transcript of the administrative record filed with the Commissioner's Answer on July 15, 2009 (docket #13).

received treatment in 2003 and 2004 from Hans G. Russell, M.D., for depression, anxiety, and left shoulder bursitis. Tr. 153-55. From April 2004 through February 2005 she received prescription pain medications and trigger point injections to treat her shoulder pain. Tr. 338-39.

Dr. Jacobson referred Tyler to Gary D. Buchholz, M.D., a neurologist, who diagnosed her with multiple sclerosis on September 29, 2004. Tr. 294. On October 21, 2004, he stated that Tyler's depression was exacerbated by her multiple sclerosis diagnosis (Tr. 154) and a few days later characterized her multiple sclerosis as "sufficiently solid" to begin treatment. Tr. 293. On December 3, 2004, he felt strongly that Tyler "is using the shoulder pain to obtain narcotics" and advised her that he would "no longer provide narcotic pain relief for her." Tr. 153.

**B.    2005**

On January 12, 2005, Dr. Buchholz noted that Tyler looked "fatigued and tired," but had "no definitive hard findings on exam." Tr. 292. He started her on Copaxone.[2] *Id.*

To evaluate rehabilitation needs related to her chronic left shoulder pain and a new right rhomboid muscle spasm, Tyler began treatment with Linda R. Carroll, M.D., on March 4, 2005. Tr. 325-27. Dr. Carroll diagnosed Tyler's shoulder pain as thoracic spine pain and myofascial pain of unknown etiology. Tr. 326-27. During the first few months of 2005, she treated Tyler by prescribing pain medications, manipulations, and trigger point injections. Tr. 320-31. On March 10, 2005, Stephan Mann, D.O, refused Tyler's request for additional Vicodin, believing that she might be abusing that medication. Tr. 324.

---

[2] Copaxone is an injectable drug that is thought to act by modifying the immune processes currently believed to be responsible for the pathogenesis of multiple sclerosis. *See* National Institute of Health, "Archived Drug Label: Copaxane," *available at*: http://dailymed.nlm.nih.gov/dailymed/archives/fdaDrugInfo.cfm?archiveid=837 (last visited June 15, 2010).

On April 18, 2005, Dr. Buchholz noted that Tyler had an injection site reaction to Copaxone treatment. Tr. 291.

Tyler visited the emergency room on June 13, 2005, and was "evaluated for arthralgias, myalgias, and asthenia." Tr. 271. The attending physician wondered if Tyler was experiencing Vicodin withdrawal. *Id.*

On June 15 and 16, 2005, Tyler was hospitalized for intravenous Solu-Medrol[3] treatment for multiple sclerosis. Tr. 181-85. On June 28, 2005, Dr. Buchholz diagnosed a reaction to that treatment and noted that although Tyler was "improved," she was dragging her left leg and exhibited sensitivity to touch and limb weakness. Tr. 290. Since Tyler reported normally working five hours, four days per week, Dr. Buchholz took her off work until mid-July. *Id.* Tyler returned to the emergency room on June 29, 2005, with a multiple sclerosis exacerbation. Tr. 265.

On August 30, 2005, Dr. Buchholz stated that Tyler was "doing better" but was "still having a lot of pain." Tr. 289. He also stated, without censure, that since Tyler was using 100-120 Vicodin pills per month, they needed to "consider a better long-term solution" and also increased her Prozac dose. *Id.* On November 7, 2005, Tyler complained to Dr. Buchholz of memory difficulties, depression, slurred speech, low energy, and bladder control problems. Tr. 288. An MRI at this time showed no change from the one done on October 6, 2004. *Id.*

Dr. Carroll continue to treated Tyler's spine pain through 2005 and on December 30, 2005, note that Tyler had "obvious rotatory dysfunction" in her mid-thoracic region. Tr. 314.

///

---

[3] Solu-Medrol is an intravenous steroid used in the treatment of multiple sclerosis. *See* "Drugs.com: Solu-Medrol," *available at*: http://www.drugs.com/pro/solu-medrol.html (last visited June 15, 2010).

C.    **2006**

On February 9, 2006, Dr. Buchholz stated that Tyler had a shaky voice, left leg "problem," and that, while Provigil[4] helped her, she could not afford it. Tr. 287. He also thought that Copaxone "could be causing some of her difficulties" and recommended switching to interferon treatment. *Id.*

On March 3, 2006, Dr. Buchholz noted that Tyler was "walking very stiffly," exhibited slurred speech, and had blurry vision and prescribed Percocet. Tr. 286. A few days later, Tyler reported pain in her legs and trouble standing. Tr. 285. On March 14, 2006, Dr. Buchholz noted that Tyler's pain decreased with medication, concluded that immunosuppressant therapy exacerbated an underlying herpes infection, and changed her medication from Copaxone to Rebif.[5] Tr. 284. On April 3, 2006, he took Tyler off work "for the short run." Tr. 283.

On April 21, 2006, Dr. Carroll noted that Tyler was working full-time and had "changed" her work hours to be with her son, that her multiple sclerosis was "stable," and that her thoracic spine pain and depression were "improved." Tr. 309-10.

On April 27, 2006, Dr. Buchholz started Tyler on Rebif and noted that she was back at work. Tr. 282. However, Tyler visited the emergency room three times in May 2006 complaining of abdominal pain. Tr. 257-59. On May 22, 2006, when Tyler reported trouble tolerating Rebif, causing a fever and chills, Dr. Buchholz stopped the Rebif therapy. Tr. 281.

Tyler again visited the emergency room on June 4 and 5, 2006, complaining of abdominal pain and depression. Tr. 254, 230-33. Imaging studies showed a pancreatic lesion caused by an

---

[4] Provigil is a medication used to promote wakefulness. *See* http://www.provigil.com/ (last visited June 15, 2010).

[5] Rebif is a type of interferon medication used to treat relapsing forms of multiple sclerosis. *See* http://www.drugs.com/cdi/rebif.html (last visited June 15, 2010).

injury when Tyler backed into a counter at her workplace one week earlier.   Tr. 238.  Tyler remained in the hospital for a few days.  *Id*.

On June 27, 2006, Tyler told Dr. Buchholz she did not want to resume interferon or steroid treatment due to side effects, but would consider Copaxone. Tr. 280.  She also reported that she had "tried to work, but job stress made her worse."  *Id*.  Dr. Buchholz stated that Tyler "cannot live without the carbamazepine."[6] *Id.*

On July 17, 2006, Dr. Carroll noted that Tyler's "thoracic spine pain waxes and wanes" and that she a "few more bad days than good days." Tr. 308.  She also specifically noted that Tyler "was not abusing her medications and not asking for medications early." *Id.*

On July 26, 2006, Dr. Buchholz stated that Tyler's condition was "stable," that she was experiencing less stress since quitting work, and that she did not want new medications.  Tr. 279.

Tyler visited the emergency room on August 7 and 15, 2006, with abdominal pain, depression, and anxiety as a result of multiple sclerosis exacerbations.  Tr. 212, 222.

On August 11, 2006, Dr. Buchholz noted that Tyler was "better" with the Solu-Medrol treatment.  Tr. 278.  However, on September 5, 2006, he took her off disease-modifying agents for multiple sclerosis and noted that she was not taking any routine medications other than Vicodin and Percocet.  Tr. 277.

Dr. Carroll again treated Tyler's left shoulder pain on September 11, 2006, stating that it "may be due to [multiple sclerosis] or to shoulder pathology."  Tr. 304.  Shoulder x-rays were normal.  Tr. 303.

---

[6]  Carbamazepine is an anti-convulsant drug used to treat seizures, nerve pain, and mania.  See "Carbamazepine," *Medline Plus*, available at: http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682237.html#why (last visited June 15, 2010).

On October 20, 2006, Tyler again visited the emergency room and was diagnosed with multiple sclerosis exacerbation, peripheral neuropathy and unspecified "muscle spasm." Tr. 208.

Four days later, Dr. Buchholz reported that Tyler was experiencing leg pain and increased fatigue, was trying anti-fatigue medications such as Provigil, and did not want more Solu-Medrol infusions. Tr. 276. On that same date, he also wrote the following letter:

> Tyler has well-defined multiple sclerosis. She has tremendous pain, which has been a difficult problem to treat. She also has significant fatigue, which couple[d] with her pain precludes her from holding any major jobs. At times she has episodes of feeling feverish with chills and sweats and has intermittent diarrhea that makes it very difficult for her to be out and about, as she needs to be right by a bathroom. She has some ongoing depression secondary to multiple sclerosis. She also has ongoing tremors in her left arm and leg. She also has trouble with concentration, remembering appointments, and making executive decisions.
>
> When coupled together, I believe all of this makes her permanently disabled because of multiple sclerosis.

Tr. 299.

On October 27, 2006, Dr. Carroll prescribed Vicodin and ordered an MRI for Tyler's shoulder pain. Tr. 300-02. On four occasions between November 20 and December 14, 2006, Dr. Carroll diagnosed stable chronic pain syndrome and left shoulder pain which she felt was likely a labral tear. Tr. 353-54, 356-58. An MRI on November 27, 2006, confirmed the labral tear. Tr. 349, 361.

On a referral by Dr. Carroll for possible surgery, Cara E. Wather, M.D., an orthopedist, diagnosed Tyler on December 11, 2006, with a left shoulder labral tear with a paralabral cyst, and left shoulder impingement. Tr. 341-43. Dr. Wather also concluded that Tyler was a candidate for laproscopic shoulder surgery. Tr. 355. On December 14, 2006, Dr. Carroll noted that Tyler's shoulder surgery was delayed due to insurance issues and refused to sign a disability form,

explaining that Tyler "may not actually be disabled" after surgery and "likely could do some work" even with multiple sclerosis.  Tr. 354.

On December 29, 2006, Dr. Buchholz characterized Tyler's gait as "stiff and ataxic" and prescribed Cymbalta instead of Prozac for depression.  Tr. 370.

**D.    2007**

From January through March 2007, Dr. Carroll found that Tyler's chronic pain syndrome was stable, diagnosed thoracic spine pain, left shoulder pain, and multiple sclerosis, and prescribed Oxycodone.  Tr. 345-50.

On March 19, 2007, Dr. Buchholz noted Tyler's fatigue and pain, reinitiated Solu-Medrol therapy, and suggested Tyler try methadone for her pain.  Tr. 369.  On May 7, 2007, Dr. Buchholz stated that the Solu-Medrol was helping and increased the methadone dosage.  Tr. 368.

According to a letter dated May 15, 2007, Tyler received 10 sessions of mental health treatment from Patrick Conway, Ed.D., to help her cope with her fatigue, pain, and hypersomnia.  Tr. 363.  Conway also completed a form dated May 6, 2007, indicating that Tyler had mild limitations in understanding and remembering detailed instructions, and moderate difficulties in social interactions with coworkers.  Tr. 364-66.

**E.    Evidence Submitted to Appeals Council**

Richard Koller, M.D., a neurologist,  performed a new patient evaluation on June 4, 2008. Tr. 389-91.  He diagnosed Tyler with multiple sclerosis, optic neuritis of the left eye, spastic paraparesis, neuralgia of the left leg, anxiety, and depression. Tr. 389.  At a follow-up visit on August 29, 2008, he noted that Tyler had trouble standing or walking "for long," that fatigue is a "major issue," and that Tyler has left hand shaking and weakness, left thigh numbness, and

clumsiness in both legs.  Tr. 393-95.  At that time, he did not believe that Tyler could work "because of her severe fatigue, her difficulty with walking, sitting, and standing."  Tr. 294.  By October 1, 2008, Tyler was not tolerating Copaxone treatment well, and Dr. Koller repeated his opinion that she could not work.  Tr. 396-98.

## II.    Tyler's Testimony

### A.    Written Testimony

On her undated initial Disability Report (Tr. 86-93), Tyler stated:

> If I get too stressed, my body just kind of shuts down.  I get depressed.  I get very achy and sore and don't even feel like getting up.  The [multiple sclerosis] affects my left side and I have less strength in my left hand and sometimes drop things.  I also have tremors in my left arm and hand.  I have dizziness problems that come and go.  I might have trouble getting down stairs and have to hold on to railings on both sides, and then when I get to the bottom of the stairs I am fine.  I get tired easily and take a nap when I get off work.  I have floaters and blurry spots in my left eye.  Their intensity varies day-to-day.

Tr. 87.

Tyler's concurrent Work Activity Report (Tr. 107-14) stated that she previously worked "up to" 30 hours per week, but had cut her hours to 20 per week on "about" December 1, 2004.  Tr. 111.

On March 30, 2004, Tyler submitted a Function Report in conjunction with her original application.  Tr. 75-82.  She reported that she lives with her son and a friend.  On a typical day she wakes her son, prepares his breakfast, and puts him on the school bus or drives him to school, then showers and goes to work.  Upon returning home, she injects herself with Copaxone, makes dinner plans, and performs household chores and shopping.  In the evening she helps her son with homework, watches television, and goes to bed.  Tr. 75.  Tyler also stated that she cares for a dog as

well as her son, with help from her housemate.  Prior to her illness, she worked longer hours, and now sleeps poorly and requires more sleep.  Tyler also stated that she has injection site reactions.  Tr. 76.

Tyler prepares meals, and cleans, does laundry, and shops for her household.  Tr. 77-78.  Her hobbies include reading, watching television, sewing, "light sports activities," games, and writing to family.  Tyler does these things daily "if I'm not hurting anywhere."  Tr. 79.  She has left hand tremors, which makes some activities, such as sewing, playing games, and writing letters, harder. *Id.*  She is not very active socially because she saves her energy for work.  She also has difficulties lifting, walking, seeing, using her hands, and has lost strength due to her multiple sclerosis.  Tr. 81.

In her Pain Questionnaire dated April 1, 2004 (Tr. 83-85), Tyler reported burning and aching pain in her back and shoulders, and burning and stinging pain at sites where she injects her Copaxone medication.  Her back and shoulder pain is almost always present, and that the injection site pain lasts four to five days after each weekly injection.  The pain is worsened by activities or injections.  Ice, heat, massage, Advil, Tylenol #3, and Vicodin relieve the pain.  Tr. 83.  Tyler also stated that she could be active for eight to nine hours before requiring rest and takes daily walks but can no longer perform past activities such as weight lifting and running.  Tr. 84.  Finally, Tyler again stated that she cares for herself and her home.  Tr. 85.

Tyler also completed another undated form entitled Disability Report - Appeal which reveals a worsening of her condition  Tr. 94-100.  Specifically, Tyler stated that her last multiple sclerosis exacerbation on June 5, 2005, "left me with symptoms including blurred vision, increased fatigue and muscle spasms.  My feet and legs hurt and I don't have control of my left leg.  I stumble and run into things."  *Id.*  She also must rest after walking a "little ways," can no longer carry items "very far," and is depressed due to her the increase in her physical symptoms.  Tr. 95.  She finds it difficult to

10 - OPINION AND ORDER

do simple things, such as remove the cap from toothpaste, put keys in locks, walk any distance, or stand any amount of time. Tr. 99. Her employment changed to accommodate these limitations. *Id*.

In a second Disability Report - Appeal dated November 22, 2005 (Tr. 135-42), Tyler stated, "I'm losing bladder control. Frequently, urgency and accidents are a serious problem. At times my speech is slurry and my voice is weak and shaky." Tr. 135. She also reported more depression and anxiety because her physical symptoms have increased. Tr. 136. Finally, she stated that she spends more time resting and that her employer has continued to accommodate her decreasing abilities in her workplace. Tr. 140.

**B.    Hearing Testimony**

At the May 14, 2007, hearing, Tyler testified that her son lives with her half the time and that she last worked on May 30, 2006. Tr. 405. She had been working as a health club receptionist 15-20 hours per week, but stopped working because she could "no longer physically manage my job." Tr. 405. Tyler explained that she was "unable to go up the stairs at times" and had to use a chair to manage front-desk reception tasks, which made the job impossible to complete. Tr. 408. She also had difficulty with balance and standing, and could not accomplish reception tasks requiring two hands, such as holding a phone and taking messages, due to her left hand shaking. Tr. 409. She felt very fatigued at work and had a left eye vision impairment which left her unable to see out of it some days. Tr. 409-10.

Regarding her other daily activities, Tyler testified that she drives around town, but can no longer drive long distances. She also no longer exercises and walks one quarter mile to the mail box once every three months. Tr. 416.

11 - OPINION AND ORDER

Tyler also testified that she receives prescriptions from Dr. Bucholz for Tegretol, Diazepam, Percocet, and Methadone, and receives Oxycontin and Oxycodone prescriptions from Dr. Carroll for her shoulder pain. Tr. 413. She used Copaxone for approximately one year, but its benefits did not outweigh the side effects. Tr. 421. She then tried Rebif which caused dehydration and cognitive side effects. Tr. 413. She currently uses an intravenous steroid. *Id.* Without specifying, Tyler said that these drugs in combination cause side effects, including fatigue and moodiness. Tr. 415. She also takes an antidepressant, Cymbalta. *Id.*

Regarding symptoms, Tyler further testified that she cannot hold anything steady with her left hand, cannot grasp objects tightly, and cannot fit a key in a keyhole. Tr. 417. She also stated that she has a constant feeling of vibration in her left leg, and at times experiences this feeling in her right leg. Tr. 418.

Finally, Tyler stated that she has improved since she stopped working which gives her more energy to care for her son and complete personal tasks. Tr. 424.

**III.     Lay Testimony**

**A.     Christopher Linsley**

Tyler's housemate, Christopher Linsley, completed a Third Party Function Report dated April 3, 2005. Tr. 123-31. He stated that Tyler performs "normal" activities and specifically, showers, prepares breakfast, gets her son off to school, goes to work, watches television, and goes to bed. Tr. 123. She also works with the public in her job at a gym, attends church, and performs other "normal" activities. Tr. 127. Lindsey does most of the yard work. Tr. 126. He also stated that Tyler had more energy and stamina before her illness, has lost weight, has difficulty lifting, using her hands, and seeing, and occasionally complains of blurry vision in her left eye. Tr. 124, 128.

12 - OPINION AND ORDER

B.    **Dale Glasscock**

Tyler's former stepfather, Dale Glasscock, testified at the hearing that he is Tyler's current caretaker, lives in her house, takes her to the hospital, fixes meals, cleans the house, and cares for her son when she cannot. Tr. 429. In the prior year, he observed that Tyler's condition had deteriorated and that she spent 60-65% of her time in bed. Tr. 430. Tyler can drive on "certain days," but does not take long trips alone, does dishes, fixes her son breakfast, and gets her son off to school. Tr. 432-33. She experiences reactions to her intravenous steroid medications, which include manic energy, increased body temperature, and bruising, and when she has a multiple sclerosis exacerbation, cannot walk and and instead "scoots" across the floor. Tr. 431-33.

## DISABILITY ANALYSIS

The Commissioner engages in a sequential process encompassing between one and five steps in determining disability under the meaning of the Act. 20 CFR §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 US 137, 140 (1987).

At step one, the ALJ determines if the claimant is performing substantial gainful activity. If she is, the claimant is not disabled. 20 CFR § 404.1520(a)(4)(i). At step two, the ALJ determines if the claimant has "a severe medically determinable physical or mental impairment" that meets the twelve month duration requirement. 20 CFR §§ 405.1509, 404.1520(a)(4)(ii), 416.909, 416.920(a)(4)(ii). If the claimant does not have such a severe impairment, she is not disabled. *Id.*

At step three, the ALJ determines whether the severe impairment meets or equals an impairment "listed" in the regulations. 20 CFR §§ 405.1520(a)(4)(iii), 416.920(a)(4)(iii). If the impairment is determined to equal a listed impairment, the claimant is disabled.

If adjudication proceeds beyond step three the ALJ must first evaluate medical and other relevant evidence in assessing the claimant's residual functional capacity ("RFC"). The claimant's RFC is an assessment of work-related activities the claimant may still perform on a regular and continuing basis, despite limitations imposed by her impairments. 20 CFR §§ 404.1520(e), 416.920(e); Social Security Ruling ("SSR") 96-8p (available at 1996 WL 374184).

The ALJ uses this information to determine if the claimant can perform her past relevant work at step four. 20 CFR §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If the claimant can perform her past relevant work, she is not disabled. If the ALJ finds that the claimant's RFC precludes performance of her past relevant work, or that the claimant has no past relevant work, the ALJ proceeds to step five.

At step five the Commissioner must determine if the claimant is capable of performing work existing in the national economy. *Yuckert*, 482 US at 142; *Tackett v. Apfel*, 180 F3d 1094, 1099 (9th Cir 1999); 20 CFR §§ 404.1520(a)(4)(v), 404.1520(f), 416.920(a)(4)(v), 416.920(f). If the claimant cannot perform such work, she is disabled. *Id.*

The initial burden of establishing disability rests upon the claimant. *Tackett*, 180 F3d at 1098. If the process reaches the fifth step, the burden shifts to the Commissioner to show that "the claimant can perform some other work that exists in the national economy, taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Id* at 1100. If the Commissioner meets this burden the claimant is not disabled. 20 CFR §§ 405.1520(g), 416.920(g).

## THE ALJ'S FINDINGS

The ALJ found that Tyler's part-time work activity after her alleged onset date of December 1, 2004, did not amount to substantial gainful activity. Tr. 17. At step two, the ALJ that

Tyler suffered from the severe impairments of multiple sclerosis, history of anxiety and depression, and history of severe left shoulder pain. *Id.* The ALJ found that these impairments did not meet or equal a listed impairment at step three. The ALJ subsequently assessed Tyler's RFC, finding that she may:

> [F]requently lift up to 10 pounds, and occasionally lift up to 20 pounds. She can stand/walk for four hours total out of an eight-hour workday, and sit at least six hours during an eight-hour workday. She can occasionally climb ramps, stairs, ladders and scaffolds, and occasionally balance. The claimant should avoid working around dangerous hazards. Secondary and including considerations of anxiety and depression, to medications, the claimant is unable to consistently understand, remember and carry out detailed instructions, and she is unable to assume great responsibility for management-type decision-making. The claimant requires ready access to a bathroom.

Tr. 18.

The ALJ found that this RFC precluded performance of Tyler's past relevant work. Tr. 24. Because Tyler possessed transferable work skills, and could perform work in the national economy, including the jobs of charge account clerk, billing sorter, and office helper. Tr. 25. Accordingly, the ALJ found Tyler not disabled through the date of his August 20, 2007, decision. Tr. 26.

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if the Commissioner applied proper legal standards and the findings are supported by substantial evidence in the record. 42 USC § 405(g); *Batson v. Comm'r for Soc. Sec. Admin.*, 359 F3d 1190, 1193 (9th Cir 2004). "Substantial evidence" means "more than a mere scintilla, but less than a preponderance." *Bray v. Comm'r of the Soc. Sec. Admin*, 554 F3d 1219, 1222 (9th Cir 2009), quoting *Andrews v. Shalala*, 53 F3d 1035, 1039 (9th Cir 1995). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*

This court must weigh the evidence that supports and detracts from the ALJ's conclusion. *Lingenfelter v. Astrue*, 504 F3d 1028, 1035 (9th Cir 2007), citing *Reddick v. Chater*, 157 F3d 715, 720 (9th Cir 1998).  The reviewing court may not substitute its judgment for that of the Commissioner. *Id*, citing *Robbins v. Soc. Sec. Admin.*, 466 F3d 880, 882 (9th Cir 2006); *see also Edlund v. Massanari*, 253 F3d 1152, 1156 (9th Cir 2001).  Variable interpretations of the evidence are insignificant if the Commissioner's interpretation is a rational reading.  *Id*; *see also Batson*, 359 F3d at 1193.

## **DISCUSSION**

Tyler contends that the ALJ improperly evaluated her testimony, the opinions of three treating physicians and a treating counselor, and Glasscock's testimony. Tyler asserts that correction of the ALJ's alleged errors compels a finding that she was disabled between December 1, 2004, her alleged onset date, and May 20, 2008, when the Commissioner found her disabled based on her second DIB application.

The Commissioner agrees with most of Tyler's assertions of error, namely that the ALJ improperly assessed her credibility, improperly assessed the opinions by Dr. Buchholz and therapist Conway, neglected to consider Glasscock's testimony, and failed to consider the severity of her multiple sclerosis during exacerbations pursuant to Listing 11.00 ("In conditions which are episodic in character, such as multiple sclerosis, . . . consideration should be given to frequency and duration of exacerbations, length of remissions, and permanent residuals").  20 CFR § 404, Subpart P, Appendix 1, § 11.00(D).  The Commissioner also concedes that substantial evidence does not support the ALJ's RFC assessment which, in turn, taints the step five finding.  As a result, the Commissioner agrees that this case should be reversed and remanded, but opposes an award of benefits.  Instead, the Commissioner seeks a remand for further administrative proceedings to determine whether the

episodic severity of Tyler's condition prevents her from performing other work in the national economy.

The decision whether to remand for further proceedings or for an immediate payment of benefits is within the discretion of the court. *Harman v. Apfel*, 211 F3d 1172, 1178 (9th Cir 2000), *cert denied*, 531 US 1038 (2000). The issue turns on the utility of further proceedings.

Under the "crediting as true" doctrine, evidence should be credited and an immediate award of benefits directed where: "(1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited." *Id* at 1178, quoting *Smolen v. Chater*, 80 F3d 1273, 1292 (9th Cir 1996). In such circumstances, the reviewing court must credit the improperly rejected evidence. *Vasquez v. Astrue*, 547 F3d 1101, 1106-07 (9th Cir 2008), *en banc review denied*, 572 F3d 586 (9th Cir 2009). It is axiomatic, however, that the reviewing court may not credit testimony and subsequently award benefits contrary to the Act. *See Vasquez*, 572 F3d at 589 (O'Scannlain J., dissenting).

Because the Commissioner concedes that the ALJ committed several errors, this court's review is limited to determining whether, when properly analyzed, the rejected evidence is supported by the record and supports an immediate award of benefits.

## I.    Tyler's Credibility

The ALJ's decision found Tyler "not entirely credible" without listing specific reasons for this finding. Tr. 21. However, the ALJ's concurrent discussion cites Tyler's activities of daily living, alleged drug and alcohol use, and the medical record. Tr. 21-22. Tyler asserts that the ALJ

erroneously cited her ability to sustain activity, use of pain medications and alcohol, her left shoulder impairment, her waxing and waning symptoms, and her cessation of multiple sclerosis drugs.  This last challenge is discussed below in conjunction with the opinion of Dr. Buchholz.

**A.    Legal Standards**

The ALJ must consider all symptoms and pain which "can be reasonably accepted as consistent with the objective medical evidence, and other evidence."  20 CFR §§ 404.1529(a), 416.929(a).  Once a claimant shows an underlying impairment which may "reasonably be expected to produce pain or other symptoms alleged," absent a finding of malingering, the ALJ must provide "clear and convincing" reasons for finding a claimant not credible.  *Lingenfelter,* 504 F3d at 1036 , citing *Smolen*, 80 F3d at 1281.  The ALJ's credibility findings must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F3d 748, 750 (9th Cir 1995), citing *Bunnell v. Sullivan*, 947 F2d 341, 345-46 (9th Cir 1991) (*en banc*).  The ALJ may consider objective medical evidence and the claimant's treatment history, as well as the claimant's daily activities, work record, and observations of physicians and third parties with personal knowledge of the claimant's functional limitations. *Smolen*, 80 F3d at 1284.  The ALJ may additionally employ ordinary techniques of credibility evaluation, such as weighing inconsistent statements regarding symptoms by the claimant.  *Id.*  The ALJ may not, however, make a negative credibility finding "solely because" the claimant's symptom testimony "is not substantiated affirmatively by objective medical evidence."  *Robbins*, 466 F3d at 883.

///

///

B.    **Credibility Analysis**

1.    **Activities of Daily Living**

The ALJ's generalized discussion cited Tyler's daily activities, including "caring for her young son, cooking, performing household chores, shopping, helping her son with his homework, and watching television." Tr. 20.  The ALJ also stated that Tyler "had a pet that she fed, watered, brushed and walked, and she was able to drive, go for walk (could walk for "miles" without stopping to rest) and ride a bicycle." Tr. 21.  Finally, the ALJ cited Tyler's church attendance, reading, sewing, "light sports activities," "playing games," and writing to family members. *Id.*  Tyler does not directly address these findings, but asserts that the ALJ improperly found that she may sustain activity.

Citation to a claimant's daily activities is properly part of an ALJ's credibility analysis. *See Lingenfelter*, 504 F3d at 1028 (stating that an ALJ may find a claimant not credible if her daily activities are inconsistent with her alleged limitations).  However, the ALJ may not penalize disability claimants for attempting to lead normal lives. *See Cooper v. Bowen*, 815 F3d 557, 661 (9th Cir 1998).  Additionally, physician-ordered exercise is compatible with a finding of disability. *Reddick*, 157 F3d at 722 n1.

The record shows that on March 30, 2004, Tyler reported most of the activities cited by the ALJ.  Tr. 75-82.  However, that date is well before her alleged onset date of December 1, 2004, and subsequent disability reports and testimony report decreased activity.  Furthermore, Tyler never reported riding a bicycle, and the ALJ provides no citation for this finding. Tr. 21.  Therefore, any reliance by the ALJ upon Tyler's daily activities to draw an adverse inference concerning her credibility is not supported by the record.

///

### 2.    <u>**Drug-Seeking Behavior**</u>

The ALJ specifically cited Dr. Jacobson's November 2002 opinion that Tyler's reported shoulder pain did not warrant "further narcotics" and another appointment in August 2004 when Tyler was given Vicodin without refills.  Tr. 21.  The ALJ stated that the record shows "a history of drug seeking (from at least two treating providers and emergency room personnel) and over-use of narcotics."  Tr. 22.  Finally, the ALJ cited Dr. Russell's December 2004 statement that Tyler was using her shoulder pain to obtain narcotics and inferred that she stopped seeing Dr. Russell for this reason.  *Id.*

The ALJ may cite a claimant's drug use and concurrent contradictory testimony in finding her not credible.  *Thomas v. Barnhart*, 278 F3d 947, 959 (9th Cir 2002).  Any inference by the ALJ of drug-seeking behavior by Tyler is based upon comments made by two physicians in November 2002 and December 2004.  While this court must affirm an ALJ's inferences that are reasonably drawn, nothing in the record suggests that Tyler deliberately misled physicians regarding her narcotic medication use after her alleged onset date.  To the contrary, during the period under review, the record shows that Tyler's treating neurologist Dr. Buchholz consistently stated that Tyler's multiple sclerosis causes "tremendous" pain.  Tr. 299.  The record also shows that Dr. Buchholz regularly refilled Tyler's narcotic prescriptions and that Dr. Carroll specifically stated that Tyler was not abusing these prescriptions.  Tr. 308.  Additionally, Tyler testified that she used a combination of narcotic drugs for her impairments.  Tr. 413.  Therefore, the record does not support the ALJ's reliance on drug-seeking behavior by Tyler.

///

*///*

### 3.    <u>Alleged Alcohol Use</u>

The ALJ cited emergency room records stating that Tyler had high blood alcohol levels. Tr. 22 (citing Ex. 11F, pp. 11, 21). The ALJ also cited Tyler's injury to her pancreas which occurred when she backed into a counter at her workplace, stating that "blood alcohol level taken later showed that she had high levels of alcohol in her system and she was assessed with pancreatitis; it is well known that pancreatitis causes severe abdominal pain." *Id.* Based on these citations, the ALJ presumably considered Tyler's alleged alcohol use in his credibility finding.

The ALJ may not find a claimant disabled if the claimant would not be disabled but for alcohol use. 20 CFR §§ 404.1534, 416.935. However, no authority suggests that an ALJ may discredit a claimant based upon her alcohol use unless the claimant makes contradictory statements regarding her substance abuse. *See Thomas*, 278 F3d at 959. The ALJ identified no contradictory statements made by Tyler regarding her alcohol use. Accordingly, nothing supports a reference to Tyler's alcohol use by the ALJ in his credibility finding.

### 4.    <u>Medical Record</u>

The ALJ specifically cited general practitioner Dr. Jacobson's November 2002 opinion that Tyler's left shoulder pain had "significant functional overlay." Tr. 21. He also repeatedly cited periods during which Tyler exhibited improvement in her multiple sclerosis symptoms. Tr. 21, 23-24.

### a.    <u>Shoulder Pain</u>

Once a claimant establishes a medically-determinable impairment, the ALJ may not reject a claimant's symptom testimony simply because the degree of reported pain is unsupported by the medical record. *Smolen* 80 F3d at 1284.

Regarding Tyler's left shoulder, the ALJ's citation to Dr. Jacobson's November 22, 2002 report of "functional overlay" (Tr. 149) pertains to a period before Tyler's alleged disability onset date of December 1, 2004. Furthermore, the record shows that Tyler was eventually diagnosed with a labral tear and paralabral cyst in that shoulder. Tr. 342. Thus, the ALJ improperly cited to Tyler's 2002 shoulder pain in finding her not credible.

### b. Waxing and Waning Symptoms

The ALJ noted that Tyler's multiple sclerosis symptoms changed over time. He cited her "waxing and waning dizziness," (Tr. 20) and multiple sclerosis exacerbations which cause blurred vision, increased fatigue, muscle spasms, and limited her ability to walk and lift. Tr. 21. The ALJ also noted that Tyler has intermittent diarrhea and incontinence and uses a wheelchair or crawls on her hands and knees during multiple sclerosis exacerbations. Tr. 23-24.

Waxing and waning symptoms do not preclude a finding of disability. *Reddick*, 157 F3d at 724. This is because "occasional symptom free periods – and even the sporadic ability to work –  are not inconsistent with disability." *Id*, citing *Lester*, 81 F3d at 833. Tyler's initial disability report stated that the intensity of her symptoms varies on a daily basis. Tr. 87. The record shows that Tyler experienced multiple sclerosis exacerbations and increased symptoms in June 2005 (Tr. 266, 268, 271, 290), in February, March, and May 2006 (Tr. 287, 258, 286), and throughout June and August 2006. Tr. 208, 213, 222, 230, 234. In July 2006 Tyler told Dr. Carroll that she experiences "good days and bad days, a few more bad days than good days." Tr. 308. The record thus establishes that Tyler experiences periodic waxing and waning of her symptoms. The ALJ's finding that Tyler experienced periods of improvement, in light of her frequent periods of acute exacerbation and underlying chronic symptoms, therefore provides no basis to discredit her.

C.    **Conclusion**

In sum, the ALJ erroneously cited Tyler's daily activities, medical record, narcotic medication and alcohol use, and fluctuating symptoms in his credibility analysis. Correcting those errors requires Tyler's testimony concerning the extent of her symptoms to be credited as true. Tyler testified that she cannot hold or grasp items with her left hand (Tr. 417), that she cannot lift or carry more than 10 pounds (Tr. 418), and that she could not attend work on a regular basis. Tr. 419. Tyler also stated that some days she cannot walk and uses a cane, a wheelchair, or crawls. Tr. 425. That testimony supports her disability claim.

II.    **Medical Evidence**

A.    **Legal Standard**

Disability opinions are reserved for the Commissioner. 20 CFR §§ 404.1527(e)(1), 416.927(e)(1). However, when making that determination, the ALJ generally must accord greater weight to the opinion of a treating physician than that of an examining physician. *Lester*, 81 F3d at 830.. The ALJ must also generally give greater weight to the opinion of an examining physician over that of a reviewing physician. *Id.* If two opinions conflict, an ALJ must give "specific and legitimate reasons" for discrediting a treating physician in favor of an examining physician. *Id* at 830. The ALJ may reject physician opinions that are "brief, conclusory, and inadequately supported by clinical findings." *Bayliss v. Barnhart*, 427 F3d 1211, 1216 (9th Cir 2005). In addition, the ALJ must ordinarily give greater weight to opinions rendered by specialists. 20 CFR §§ 404.1527(d)(5), 416.927(d)(5).

///

///

23 - OPINION AND ORDER

B. **Analysis**

1. **Treating Neurologist Dr. Buchholz**

The ALJ cited, but did not discuss, Tyler's lengthy treating relationship with Dr. Buchholz, which lasted from September 14, 2004, until May 7, 2007, when the record closes. Tr. 23. The ALJ instead noted Dr. Buchholz's reports that Tyler was "doing well" in December 2006 and "doing fairly well" in May 2007. *Id.* This analysis does not reflect Dr. Buchholz's other treatment records which show regular multiple sclerosis exacerbations and Tyler's progressive neurological deterioration throughout the period under review. The ALJ may not selectively read the record. *Howard v. Barnhart*, 341 F3d 1006, 1012 (9th Cir 2003).

The ALJ also rejected Dr. Buchholz's disability opinion because the record "showed that [Tyler] was not always amenable to his treatment recommendations" and "showed significant periods of doing quite well and no 12-month duration of disability." Tr. 24. The ALJ provided no citations for those findings. The record in fact shows that Tyler discussed medication protocols with Dr. Buchholz and changed her medications several times under his direction due to side effects. Tr. 276-94. Dr. Buchholz made no notations that Tyler changed her treatment regimes against medical advice.

With respect to the 12-month period of disability, the record shows that Tyler experienced numerous multiple sclerosis exacerbations and ongoing pain, motor control, and visual symptoms between July 2006 and May 20, 2008, when the Commissioner ultimately found her disabled. As previously noted, a claimant's symptoms may wax and wane during a period of disability. A finding that the record shows periods of Tyler "doing quite well," without further explanation or citation, fails to establish that Tyler was not disabled.

According to Dr. Buchholz, Tyler experiences significant limitations stemming from her multiple sclerosis, shoulder pain, and prescription medication side effects. Additionally, on October 24, 2006, Dr. Buchholz opined that Tyler could not maintain work activity due to her pain and fatigue. Tr. 299. This statement is supported by Dr. Buchholz's treatment notes showing that Tyler experienced multiple sclerosis exacerbations throughout the period in question which continued despite some intermittent improvement in her symptoms. Tr. 286-87, 290, 305. Dr. Buchholz's opinion thus supports a finding of disability.

### 2.    Treating Physician Dr. Carroll

The ALJ did not discuss Dr. Carroll's treatment notes, but noted her December 2006 refusal to complete a disability form relating to Tyler's left shoulder. Tr. 23. The ALJ also cited Dr. Carroll's statement that Tyler could "likely do some work" even with her multiple sclerosis symptoms. *Id.*

The ALJ omitted any citation or discussion pertaining to Dr. Carroll's notes produced between February 2005 and March 2007. These treatment notes constitute a significant portion of the record which the ALJ should have considered. Those notes show that Dr. Carroll continued to diagnose Tyler with a chronic pain disorder and to prescribe narcotics for Tyler's left shoulder pain between July 2006 and January 2007. Tr. 308, 347, 349, 354. Moreover, Dr. Carroll treated Tyler for her shoulder pain, not for her multiple sclerosis. With respect to Tyler's limitations caused by multiple sclerosis, the ALJ should have deferred to Tyler's treating neurologist, Dr. Buchholz.

According to Dr. Carroll, Tyler experiences significant limitations stemming from her shoulder pain absent corrective surgery and from prescription medication side effects. This supports Tyler's claim of disability.

### 3.    Treating Neurologist Dr. Koller

Dr. Koller treated Tyler between June 4 and October 1, 2008, when the record closes.  Tr. 389-98.  Because this treatment began after the date of the ALJ's decision, the ALJ did not have an opportunity to review his notes.  Tyler submitted Dr. Koller's treatment notes to the Appeals Council, which accepted them into the record but denied review of the ALJ's decision.  Tr. 6-9.  Tyler now asserts that the Appeals Council erred by failing to address Dr. Koller's opinion which supports the opinions of Dr. Buchholz and therapist Conway.  She asserts that Dr. Koller's opinion describes a disability which has existed since her alleged onset date.

In his opinion, Dr. Koller did not state that he considered Tyler's condition prior to his treatment of her. Tr. 389-99.  In fact, On October 1, 2008, he stated that he "would like to review [Tyler's] old records and MRI scans."  Tr. 390.  This statement indicates that as of that date, he had not reviewed these prior records.  Moreover, Dr. Koller's notes pertain to the period after May 20, 2008, when the Commissioner ultimately determined that Tyler was disabled.  Medical records may show disability relating to a prior period, particularly regarding progressive diseases.  SSR 83-20 at *2 (available at 1983 WL 31249).  However, Dr. Koller's notes do not address Tyler's condition prior to his treatment of Tyler between June and October 2008.  Tr. 389-96.  Therefore, those notes are immaterial to Tyler's alleged disability prior to May 20, 2008.

### 4.    Therapist Conway

The ALJ noted Conway's May 15, 2007 letter, but noted that the record does not include his chart notes and that Conway made no specific endorsement of disability.  Tr. 23.

The ALJ may reject medical source opinions unsupported by treatment notes.  *Bayliss*, 427 F3d at 1216.  Tyler's counsel stated at the May 14, 2007, hearing that he would submit Conway's

therapy treatment notes to the ALJ. Tr. 403. The record does not show that this submission was made. Therefore, the ALJ's finding that Conway's May 15, 2007 letter was unsupported by Conway's treatment notes is based upon the record. Accordingly, Conway's opinion should not be considered.

## III.    Lay Testimony

### A.    Legal Standards

The ALJ has a duty to consider lay witness testimony. 20 CFR §§ 404.1513(d), 404.1545(a)(3); *Lewis v. Apfel*, 236 F3d 503, 511 (9th Cir 2001). Friends and family members in a position to observe the claimant's symptoms and daily activities are competent to testify regarding the claimant's condition. *Dodrill v. Shalala*, 12 F3d 915, 918-19 (9th Cir 1993). The ALJ may not reject such testimony without comment and must give reasons germane to the witness for rejecting her testimony. *Nguyen v. Chater*, 100 F3d 1462, 1467 (9th Cir 1996). However, inconsistency with the medical evidence may constitute a germane reason. *Lewis*, 236 F3d at 512.

### B.    Analysis

The ALJ did not address Linsley's Disability Report which confirmed that Tyler has difficulty lifting, using her hands, and seeing. Tr. 128. Silent omission of lay testimony is harmless only when the reviewing court may "confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination." *Stout v. Barnhart*, 454 F3d 1050, 1056 (9th Cir 2006). Because the ALJ's RFC assessment found no limitation relating to Tyler's fatigue or vision impairment (Tr. 19) as described by Linsley, the ALJ's omission of his testimony is not harmless. As a result, that testimony should be credited.

The ALJ noted, but did not explicitly reject, Glasscock's testimony. Tr. 24. Glasscock testified that Tyler spent 60-65% of her time in bed during the year prior to the May 2007 hearing and cannot walk during multiple sclerosis exacerbations. Tr. 430-31. By not including these limitations in Tyler's RFC assessment, the ALJ implicitly rejected Glasscock's testimony. As conceded by the Commissioner, the ALJ failed to provide germane reasons for rejecting Glasscock's testimony. Because that testimony supports a finding of disability, it should be credited.

## IV.    Remand

In determining whether to award benefits or remand the matter for further proceedings the court must determine whether "outstanding issues remain in the record." *Harman*, 211 F3d at 1178. The Commissioner requests a remand to obtain new evidence, if necessary, from a medical expert to clarify the nature and severity of Tyler's limitations. However, the record is sufficiently developed in that regard.

The final issue is whether the record clearly requires an award of benefits after the improperly rejected evidence is credited. *Id*. The vocational expert testified that a claimant who is unable to complete a 40-hour workweek would be unable to perform work in the national economy. Tr. 442. Because the credited testimony establishes that Tyler could not perform such work, the vocational expert's testimony establishes that Tyler may not perform work in the national economy at step five in the sequential proceedings. Consequently, Tyler is disabled under the Commissioner's regulations as of her December 1, 2004 alleged onset date.

///

///

///

28 - OPINION AND ORDER

## **ORDER**

The ALJ's decision is not based upon the appropriate legal standards or substantial evidence.

Crediting the improperly rejected testimony establishes that Tyler is disabled under Titles II and XVI

of the Act as of her December 1, 2004 alleged onset date.  Therefore, the ALJ's decision is reversed

and remanded for the immediate calculation and award of benefits.

Dated this 15th day of June 2010.


s/  Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge